HON. JAMES L. ROBART

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

| | |
|---|---|
| SHIRLEY LACY,<br><br>                     Plaintiff,<br>   vs.<br><br>K. L. VILLANEUVE,<br><br>                   Defendant. | NO. CV 03-2442 JLR<br><br>DECLARATION OF JESSE WING IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO ENLARGE TIME TO CONCLUDE DEFENDANT'S CASE-IN-CHIEF<br><br>**Hearing Date:  Monday, January 30, 2006** |

11

12

13

14

15

16    I, Jesse Wing, state as follows:

17    1.    I am one of the attorneys for the plaintiff in this matter, and have knowledge of

18    the facts contained herein.

19    2.    Attached hereto as Exhibit 1 is a true and correct copy of excerpts of deposition

20    of Richard Startz, Ph.D. taken October 5, 2005.

21    DEC OF JESSE WING IN SUPPORT OF PLTF'S
      RESPONSE TO DEF'S MO TO ENLARGE TIME etc. - 1
22    USDC WD WA CV 03-2442 JLR

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

3.       Attached hereto as Exhibit 2 is a true and correct copy of excerpts of deposition of Richard Startz, Ph.D. taken December 8, 2005.

4.       Attached hereto as Exhibit 3 is a true and correct copy of excerpts of deposition of Avery Mason Guest, Ph.D. taken September 8, 2005.

5.       On July 14, 2005, plaintiff's counsel had hand-delivered to defense counsel the expert and supplemental reports of Avery Mason Guest, Ph.D., including a CD ROM containing all data and variables on which Dr. Guest based his opinions.  A true copy of the Declaration of Service for these reports and data, and the Supplemental Expert Report, are attached hereto as Exhibit 4.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true to the best of my knowledge.

DATED this 25ᵗʰ day of January, 2006, at Seattle, Washington.



Jesse Wing

DEC OF JESSE WING IN SUPPORT OF PLTF'S
RESPONSE TO DEF'S MO TO ENLARGE TIME etc. - 2
USDC WD WA CV 03-2442 JLR

MacDonald Hoague & Bayless
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

# CERTIFICATE OF SERVICE

    I hereby certify that on January 25 , 2006, I electronically filed the foregoing DECLARATION OF JESSE WING IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO ENLARGE TIME TO CONCLUDE DEFENDANT'S CASE-IN-CHIEF with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the below listed attorneys:

Paul J. Triesch, WSBA 17445
Email: PaulT@atg.wa.gov
Timothy E. Steen, WSBA 35560
Email: TimothyS@atg.wa.gov
Assistant Attorney Generals
Attorney General of Washington
Tort Claims Division
Mail Stop TB 14
900 4th Ave, #2200
Seattle, WA 98164-1012
Attorneys for Defendant
Tel: 206-464-7352
Fax: 206-587-4229

                                                     /s/ Jesse Wing         .
Jesse Wing, WSBA 27751
Attorneys for Plaintiff
MacDonald Hoague & Bayless
705 2nd Ave #1500
Seattle, WA 98104
Tel: 206-622-1604
Fx:  206-343-3961
Email jessew@mhb.com

DECLARATION OF SERVICE - 3

MacDonald Hoague & Bayless
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

# EXHIBIT

# 1

4

Page 1

1          UNITED STATES DISTRICT COURT OF THE STATE OF WASHINGTON

2                       WESTERN DISTRICT AT SEATTLE

3    _____

4    SHIRLEY M. LACY,                    )
                                         )
5                       Plaintiff,       )
                                         )
6              vs                        )NO. CV03-2442-P
                                         )
7    KAREN VILLENEUVE,                   )
                                         )
8                       Defendant.       )

9    _____

10              DEPOSITION UPON ORAL EXAMINATION OF

11                       RICHARD STARTZ, Ph.D.

12   _____

13                       1:00 o'clock p.m.

14                       October 5, 2005

15                    University of Washington

16                   Room 101, Gerberding Hall

17                      Seattle, Washington

18

19

20

21

22

23   SHERRI DEWITT, CCR #29906

24   Court Reporter

25

Page 30

1 testimony.
2 Q Have you ever consulted on another case involving race
3 discrimination?
4 A Yes.
5 Q I don't know if you are including the Smith versus UW
6 case, but I mean apart from that.
7 A Yes, I have apart from that.
8 Q How many?
9 A I'm not sure. I can remember two.
10 Q What are the general facts?
11 A They were personnel cases. Actually, let me take that
12 back. One of them was an age discrimination case. And
13 there was one which was a race discrimination case, which
14 was a personnel case where race discrimination was
15 alleged. And I've also consulted on -- I'm sorry.
16 Maybe if you could repeat the question.
17 Q Have you consulted on any cases involving race
18 discrimination?
19 A Yes. And I also did some consulting on a case involving
20 in a very broad sense discrimination and school
21 assignments, racial discrimination.
22 Q Okay. Are you talking about UW versus Smith?
23 A No, I'm not.
24 Q Because let's just set aside --
25 A No, I'm talking about in addition to that.

Page 31

1 Q When you say school assignments, at what level of school?
2 A Public school.
3 Q And for whom did you provide consulting? And I'm not
4 actually asking the name, but the plaintiff or the
5 defendant; and if it didn't get into court, I mean the
6 person complaining or the person being complained against.
7 So I'll just rephrase the question with those principals
8 in mind.
9 A Okay.
10 Q For what party did you consult with the age discrimination
11 case?
12 A That was the defendant.
13 Q And for what party did you consult on the race
14 discrimination case in the personnel area?
15 A That was the defendant.
16 Q And for what party did you consult regarding the public
17 school discrimination for which case you believe was one
18 of the elements or one of the issues?
19 A I think I want to -- let me say school assignment involved
20 race, whether it involved discrimination might be an
21 arguable point, I guess. And I'm pretty sure that was the
22 defendant as well.
23 Q And to your recollection, none of those three matters ever
24 resulted in active litigation?
25 A I didn't say that.

Page 32

1 Q I apologize. Do you mean that you were only consulting
2 because you never actually expressed an opinion that was
3 shared with the other side of the court?
4 A That's right, so far as I know. And I want to be clear,
5 I've certainly consulted with attorneys and I may have
6 written some things; I don't remember. I don't know what
7 they did with them, but I have no reason to believe
8 that -- I'm quite certain nothing made it as far as the
9 court. Let me hold on for a second. Am I certain about
10 that? I think I am certain that nothing made it as far as
11 court.
12 Q If in your thinking about that further you discover that
13 there is such a thing, I would like to receive a copy of
14 it.
15 A I would certainly see that you do.
16 Q Okay. What percentage of your time would you say in the
17 average week or month is involved in providing
18 consultation or expert opinions? And by that I mean more
19 broadly not necessarily in litigation but to parties.
20 A A very small fraction of my time. If I were to take a
21 guess, and it's certainly only a guess, I would say less
22 than ten percent.
23 Q What were you hired to do in this case?
24 A I was hired, well, I'll have to speak to my understanding
25 as to why I was hired. I can't speak for the Attorney

Page 33

1 General's Office.
2 Q They are not going to let me take his deposition so we are
3 going to have to rely on you.
4 MR. TRIESCH: You can try if you want.
5 A In my understanding that is -- I won't speak to what their
6 intention is, although I kind of hope we had a meeting of
7 minds -- in the first instance to advise them on
8 statistical and quantitative issues. And in the second
9 instance to prepare an expert report and testify.
10 Q Was there a point at which -- strike that.
11 At the time that you first agreed to serve as an
12 expert for the defendant in this case, did you already
13 decide that you would in fact issue a rebuttal report on
14 behalf of the defendant?
15 A No.
16 Q At what point did you determine -- and you are welcome to
17 consult any of the documents that -- that you would in
18 fact issue a rebuttal opinion?
19 A I can't give an exact date. I received Professor Guest's
20 report and several, I believe at the same time, a copy of
21 one of the WSU reports and several SPSS files, which
22 Professor Guest very courteously supplied through counsel.
23 And so I guess it would be basically shortly, well,
24 I'm sorry. Let me be careful. It was shortly after that
25 that I began looking at it and trying to see which part

9 (Pages 30 to 33)



Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

Page 34

1   seemed correct, which parts I thought there might be a
2   question about.  And I suppose at some point, the Attorney
3   General's Office asked me formally to please prepare a
4   rebuttal, if that's the term for it, of expert report, and
5   I did.
6   Q  Do you believe that by the time you had written Report No.
7      1, which is the first Page of Exhibit 3, you had already
8      agreed to issue a rebuttal report?
9   A  I'm not sure.
10  Q  Is that anything, reviewing any document that would help
11     refresh your recollection as to when you made that
12     decision?
13  A  Well, the time sheets show that on September 4th I did a
14     first preliminary opinion.  And at that point, perhaps
15     earlier, but certainly by that point, I decided it's
16     appropriate to issue a report.
17  Q  But as you sit here you can't tell whether it was after or
18     before the date that you wrote your first report to
19     Mr. Triesch that you made that decision?
20  A  That's right; I cannot tell.
21  Q  Do you recall certain a fact or set of facts or discovery
22     on your part that lead you to believe it was appropriate
23     to issue a rebuttal report?
24  A  Well --
25        MR. TRIESCH:  I just want to object to the form of

Page 35

1   the question as counsel keeps referring to his report as a
2   "rebuttal report" and that's a term of his own making,
3   it's not what it's termed by Dr. Startz.
4        Anyway go ahead, answer it.
5   A  The process I followed was to take a look at Professor
6   Guest's work, as well as other material prepared in these
7   informal reports that we've marked as Exhibit 3 to try to
8   communicate my understanding to the Attorney General's
9   Office the decision that there should be an expert report
10  written.  They at some point asked me to do so, and I was
11  perfectly prepared to do so.  But if a client didn't want
12  me to testify, I suppose, I wouldn't.  I don't know.
13  Q  I'm not sure if my question was stated very clearly.  I'm
14     trying to figure out whether there was a fact or set of
15     facts that caused you to decide, "Aha, this deserves a
16     response by an expert, and I'm prepared to provide that
17     response"?
18  A  Well, I'm not sure that I would, except it's -- again, you
19     understand I wasn't speaking in legal terms.  I wasn't
20     thinking of this purely as a response.  I was thinking of
21     it as I had Professor Guest's work, some parts of which
22     are clearly exactly right.  And that I was trying to state
23     my opinion as to what could be learned about the case from
24     a statistical analysis, some part of which was following
25     from the previous best work on the issue, which would be

Page 36

1   Professor Guest's report.
2   Q  Were you ever told that your report needed to be in the
3      form of a rebuttal and that you were not in a position to
4      simply provide an alternative viewpoint?
5   A  No.
6   Q  You've mentioned earlier that your wife is an economist,
7      and I have seen some of, on your vitae that she has
8      co-authored some journal articles with you, if that is the
9      right phrase; is that the right phrase?
10  A  It is the right phrase.
11  Q  Okay.  It appeared to me that on each of the journals,
12     journal articles that dealt with the issue of race that
13     she was a co-author with you; is that correct?
14  A  I believe that's correct; yes.  Yes; I believe it's
15     correct.
16  Q  Is there an inference to be drawn from whether a person's
17     name is first or second as the author on a journal
18     article?
19  A  Yes, there is.
20  Q  What is the inference?
21  A  Alphabetical order.
22  Q  Okay.
23  A  This is -- to be helpful -- this varies in different
24     fields.  In many fields, first authorship very
25     significantly means the primary author.  In economics it

Page 37

1   sometimes means that but almost always means alphabetical
2   order.
3   Q  Can you generalize about whether you or she was the
4      primary author of the articles that were written regarding
5      race and economics?
6   A  They are truly co-authored.
7   Q  During the course of your preparation of any of the work
8      you did in this case, did you consult with your wife?
9   A  We chatted about a few things; yes.
10  Q  Did you chat with her as your wife or as a professional
11     colleague?  And if we need to spend more time on it, we'll
12     do that.  But there's discussion around the dinner table
13     about, "What you did today" versus "You have professional
14     expertise in this area and I'd like your input."  Would
15     you agree with me there's a distinction there?
16  A  In our house that's actually a hard distinction to make.
17  Q  Okay.
18  A  But let me try to be helpful.
19        MR. TRIESCH:  Well, let me make a statement for the
20     record here, counsel.  If you are drawing a distinction
21     for the legal purpose of setting up some kind of an
22     inquiry into what might otherwise be privileged as husband
23     and wife communication, I think it's inappropriate.  There
24     is a privilege about discussions between spouses, and I
25     don't know that you are entitled to inquire about that,

10 (Pages 34 to 37)

Page 50

1  to apples, but the more you narrow the set of data, at
2  some point you won't be able, there's no chance to
3  conclude anything. So I might have done that.
4      Another possibility is whether -- I looked at a, I
5  guess it was State Patrol website, which gives some
6  general description of where these things are. And APA 5
7  seems to cover a pretty broad range. One, therefore,
8  might use District 202. One might consider whether there
9  are parts of APA, I believe it's APA 6 there are more
10  similar. Or as in this case, and as I think reflected in
11  some other parts of the report, there was a question of
12  would it make more sense to confine it to particular
13  mileage posts because those were a better definition or
14  more homogenous geographic area.
15  Q  Do you think that Professor Guest's selection of APA 5 for
16  the analysis that he did was in any way invalid for the
17  reasons you've described?
18  A  I don't want to use the term "invalid". I actually do
19  have some significant concern as to whether using all of
20  APA 5 is sufficiently homogenous with the set of basic
21  people who would be driving past a trooper, that it's a
22  representative sample. So that's a concern I have, but I
23  don't -- using this term "invalid" is further than I'd
24  want to go.
25  Q  Did you do any statistical calculations yourself which

Page 51

1  revealed a difference between APA 5 and District 202?
2  A  Well, of course there are differences. But can I
3  interpret the question as to whether there were important
4  differing conclusions one would draw?
5  Q  Yes.
6  A  Okay. In terms of the specific comparison between APA 5
7  and District 202, there are two issues. One is what was
8  the percentage of stops. And I did not find that there
9  was an important difference between those two.
10      A second issue is would there be a difference in
11  statistical significance. And I don't have an answer for
12  that.
13  Q  Because you didn't look?
14  A  Because either I didn't look or I looked and I've
15  forgotten the answer.
16  Q  I'm sorry?
17  A  Either I did not look or I looked quickly and forgot the
18  answer and --
19  Q  Okay.
20  A  But, for example, if you were to look at Report 2 here,
21  there is an analysis limited to District 202. And what it
22  says is, quoting myself, "The results are not noticeable
23  different from those reported by Professor Guest for all
24  of APA 5", but there's not a statistical significance test
25  attached there.

Page 52

1  Q  So as you sit here, although you have a significant
2  concern about whether the use of APA 5 is sufficiently
3  homogenous, you have not done or cannot recollect any
4  calculations that you've done that addresses that concern?
5  A  I don't think that was what I testified.
6  Q  Well, I understand that you have written Report No. 2 in
7  which you just testified you didn't find anything
8  noticeably different; is that correct?
9  A  No. Read the whole sentence.
10  Q  "The results are not noticeably different from those
11  reported by Professor Guest"?
12  A  I shouldn't say the whole sentence. I don't mean to be
13  rude. This was limited to specifically a comparison to
14  District 202. If you are asking did I, when I was
15  exploring, find any I thought terribly different from
16  District 202 from APA 5, then the answer to that is no, I
17  didn't.
18  Q  Did you do any calculations in which you thought that a
19  finding, the results of your findings for APA 6 were
20  noticeably different from those reported by Professor
21  Guest for APA 5?
22  A  No. I don't -- I should say I don't remember doing any
23  calculations such that I found any difference. I'm not
24  quite sure if I did such calculations, but I did not find
25  any such difference.

Page 53

1  Q  Okay. Have you made plans to do any further calculations
2  that you know of at this point?
3  A  I do not have any specific plans, but some may arise.
4      MR. TRIESCH: Counsel?
5      MR. WING: Do you want to take a break?
6      MR. TRIESCH: It's up to you. We're up on a hour
7  and a half, and I'm just letting the witness know he has
8  the opportunity -- at some point, I will need a personal
9  comfort break.
10      MR. WING: Sure.
11  A  Either now or 15 minutes from now would be fine. Whatever
12  is good for you.
13  Q  Okay. Thank you.
14  A  Good for Paul, too.
15      MR. TRIESCH: Thank you.
16  BY MR. WING:
17  Q  If you look at Report No. 4, which is part of Exhibit 3.
18  I believe in your report you site contact that you had
19  with WSU Professor Clayton Mosher; is that correct?
20  A  That's right.
21  Q  Was that by telephone, by e-mail, some other form?
22  A  E-mail.
23  Q  Okay. Did you learn anything else from Professor Mosher
24  besides that the coded period in the data base was 7 a.m.
25  through 7 p.m. inclusive as daylight hours?

14 (Pages 50 to 53)

Page 58

1  Q  Okay. If I'm correct in your final report, you did
2     reference the Washington State University report in which
3     they made reference to --
4  A  Yes, I did.
5  Q  Okay. Just let me finish.
6  A  I'm sorry. I apologize.
7  Q  That's okay. The Washington State University made
8     reference to possible errors that troopers made in racial
9     identification; is that correct?
10 A  This refers to, I think it's Paragraph 9 in my report, I
11    referenced their report which was, to the best of my
12    understanding, in regard to overall trooper accuracy, not
13    by the individuals.
14 Q  Okay. I'm not going to mark this as an exhibit because I
15    think this would be unnecessary use of paper, but I'm
16    going to show you the report and ask you if this looks
17    like the 2005 Washington State University report that you
18    consulted?
19 A  I believe that it is.
20 Q  Okay. And then I'm going to show you a particular page,
21    which has the heading Executive Summary. And there's a
22    highlighted portion there. Do you see it's Paragraph 1?
23 A  I do; yes.
24 Q  Would you read that out loud, please?
25 A  "Our analysis of DOL" - one word - "driver photo auto data

Page 59

1     indicates a high level of consistency with regard to race
2     designation made by troopers in the field and members of
3     the WSU audit team reviewing official photos and documents
4     in the DOL. Our results also indicate a high degree of
5     consistency between troopers race codes on TAR's forms and
6     on citations. In short, there is no evidence that
7     troopers are systematically miscoding race on either the
8     TAR's forms or citations."
9  Q  Do you have any evidence to the contrary?
10 A  No.
11 Q  Okay. You did not quote that portion of the report in
12    your final report, did you?
13 A  No, I did not.
14 Q  Okay. Why not?
15 A  It's always hard to answer a sort of prove the negative
16    type question. I didn't see a reason to quote it so I
17    didn't quote it.
18 Q  Do you believe that Paragraph 9 of your report as written
19    sufficiently conveys the message of the language that you
20    just read?
21 A  Well, I'm not attempting to convey the language of what I
22    just read.
23 Q  What were you attempting to convey in Paragraph 9?
24 A  That based on the WSU study that it's not unusual for
25    there to be disagreement over racial identification in a

Page 60

1     particular case. So something which, from my
2     understanding of the WSU study, they did not deal with was
3     whether some troopers are better or worse or even biased
4     or unbiased, that they were, my understanding of the WSU
5     study is they were making a statement of about on average
6     did people get race, I think they say race right, although
7     in this case it just means agreement, because that was all
8     that was necessary for what they were looking at. That's
9     not all that's necessary for talking about one individual
10    versus others.
11 Q  Do you believe that the database, the statewide database
12    that Professor Guest used and you used for statistical
13    calculations is invalid for the purposes that were used in
14    this case because there may have been some difficulty in
15    troopers identifying the race of those individuals they
16    stopped?
17 A  The word "invalid" isn't appropriate, either yes or no.
18    No data set is perfect. It's rare for a data set to be
19    worthless; they are more or less problematic. And the
20    purpose of this was to raise the issue that there's some
21    reason to believe that there's some ways that are very
22    much relevant to this case that this database may be
23    problematic.
24 Q  How would you go about determining whether it is
25    problematic for a statistical purpose?

Page 61

1  A  I don't believe you could do that from the database
2     itself. What one would -- what I hoped might be possible
3     would be to do the kind of study that the WSU people did
4     where you have several trained raters, they are sometimes
5     called, who would decide on race. And then -- but
6     comparing those to existing reports by troopers and
7     essentially discover two questions. One is are some
8     troopers simply more accurate on average than other
9     troopers in identifying race. And the other is are some
10    troopers persistently off on one side.
11       So my understanding of the WSU finding is that there
12    are at least two possibilities. One is that most or all
13    troopers guess - guess is not the right word - identify
14    the same racial percentages as these trained raters do,
15    but another could be that half are too high or half are
16    too low. And from what I was able to read, it didn't
17    speak to that question.
18 Q  If other troopers -- well, strike that.
19       Can you think of a reason why in the context of this
20    data collection that the Washington State Patrol requires
21    its troopers to do, why anybody would intentionally
22    identify their stops as being African-American when they
23    were not?
24 A  Well, let me qualify this by saying that I regard myself
25    as an expert on statistics and some other things, but not

16 (Pages 58 to 61)

Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

Page 62

1  on the field behavior of state troopers.  But having said
2  that, I think you asked why somebody would intentionally
3  overidentify African-Americans.  And I don't see why
4  someone was particularly likely to do that.
5  Q  Okay.  So if other troopers besides Karen Villeneuve would
6  not overidentify, your theory is that they might
7  underidentify and, therefore, she would stick out; is that
8  how this would be relevant?
9  A  Well, I want to be careful.  There's the issue of
10  intentional --
11  Q  Uh-huh.
12  A  -- or not.  One of the examples which is a concern is that
13  racial identification is actually quite hard.  In fact, in
14  some sense it's not scientifically meaningful, but
15  culturally we use it anyhow.  So the issue is if somebody
16  has dark skin, but is not very dark, I think it's quite
17  possible that some people decide to err on the side of
18  identifying them as white or would be unsure.  And that in
19  fact, and I want to be clear that this is a question, this
20  is not, this is unfortunately not something that I think
21  that we have evidence on.  You might find, for example,
22  that African-American troopers identify more
23  African-Americans because they are less embarrassed -
24  embarrassed may not even be the right word - they just
25  don't worry about making such an identification.  And that

Page 63

1  might have something to do with Trooper Villeneuve.  I
2  think everybody brings their own background to this kind
3  of identification and it's not necessarily either
4  scientific background, it's how they grew up and stuff
5  like that.  So, there might well be a variety of behavior
6  about accuracy and it would be scientifically very
7  interesting to know about, but there doesn't seem to be
8  much evidence.
9  Q  Well, apart from intentional misidentifying individuals
10  based on their race, wouldn't you expect any errors to be
11  random?
12  A  No.
13  Q  Why not?
14  A  Because people's identification of people by race can be
15  entirely honestly intended and errors can be
16  unintentional, but their life experiences might very well
17  affect their identification.
18  Q  I'm probably not asking my question in a way -- I'm not
19  doing a got job of it.  But if you have several hundred
20  troopers, wouldn't you expect those individual troopers
21  who may not be as accurate in their identifying
22  individuals based on race to be randomly distributed such
23  that every statistical calculation is going to include
24  some errors, but not in a way that would change the
25  validity of any particular calculation?

Page 64

1  A  No, I would not suspect that.
2  Q  Why is that?
3  A  Well, I'll give you an historical example.  In the, I
4  believe it was post Civil War South census records race --
5  the story is actually a little disgusting.  They used to
6  send census takers out with paddles with different colors
7  on them that they could surreptitiously hold and look at
8  the person because you couldn't ask somebody if they were
9  white or black because you might get shot.
10      And this is for many people, not for all, for many
11  people this is a very sensitive subject and I wouldn't be
12  at all surprised if they erred persistently in one
13  direction or another or in different circumstances for a
14  wide variety of factors.  I mean, we know from the WSU
15  study that they are sort of trained experts in sort of an
16  easy, emotionally easy set up as possible.  They weren't
17  involved with the people there, not infrequently disagreed
18  with each other.  And one would expect they probably did a
19  better job -- I should be careful.  They may not have done
20  a better job than the trooper on the street.  And maybe on
21  the other hand, the trooper, because they meet people all
22  of the time, they turn out to be better.  I just don't
23  know.
24      So I want to be clear that I'm not saying that I know
25  for a fact that there is a bias one way or the other, but

Page 65

1  this is one of those areas in which there is reason to be
2  concerned of possible biases.
3  Q  I'm going to try one more time.  I think I understand your
4  point.  And the point I'm concerned with is wouldn't you
5  expect that those biases would be manifested in such a way
6  that they may be overidentifying or underidentifying, and
7  that unless you could show some sort of systematic over-
8  or underidentification, these errors would wash out?
9  A  No, I would not expect them to wash out.  They might, but
10  I don't think there's any reason or priority to think they
11  would wash out.
12  Q  So you believe there's a concern that there may be some
13  biases; is that correct?
14  A  There may -- I have a concern -- I'm not even sure I want
15  to accept the use of the term "bias".  I think that I have
16  a concern that there are different levels of accuracy of
17  racial identification by different troopers.
18  Q  Uh-huh.
19  A  And I have a concern that in different situations or among
20  different troopers, there may be persistence one way or
21  persistence the other way.  I don't know.  But because
22  it's a particularly sensitive subject in our culture, I
23  worry significantly about the accuracy.
24      MR. WING:  Okay.  Why don't we take a break.  Thank
25  you for staying with that.

17 (Pages 62 to 65)

Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

Page 66

1       (Off the record discussion.)
2       (Recess in proceedings.)
3   BY MR. WING:
4   Q  Looking at your Report No. 4.
5   A  Yes.
6   Q  You wrote on Page 2, "The results reported here differ
7       somewhat from those found by Professor Guest."
8   A  I'm sorry.  Let me catch up with you first.
9   Q  I'm sorry.
10  A  Yes.
11  Q  In what way?  And let me just say, I've got a copy of his
12      report; would that help you?
13  A  It might in a bit, but I think for the moment, I think
14      what I was referring to is that the numbers I computed
15      were not exactly the same as the ones Professor Guest
16      computed.
17  Q  Okay.  You then said, "Trooper Villeneuve shows little
18      differences in stops by race by day versus night."  What
19      were those differences?
20  A  That -- I've got this right.  That a fraction of Trooper
21      Villeneuve's stops, the fraction of the stops who were
22      African-Americans were 12.6 at night, according to my
23      calculation, versus 13.0 during the day.
24  Q  And what did you find with regard to other troopers?
25  A  That they were 9.3 percent at night and 6.9 percent during

Page 67

1       the day.
2   Q  So, Trooper Villeneuve stops a higher percentage of
3       African-Americans during the day than she does at night
4       according to your calculation; is that right?
5   A  A very small higher percentage; yes.
6   Q  And the other troopers -- now, is this for the state or in
7       APA 5?
8   A  Well, one might hope for better documentation, but I
9       believe that this is in APA 5.
10  Q  Okay.  The other troopers in you believe APA 5 stop more
11      African-Americans at night than they do during the day?
12  A  That's correct.
13  Q  Which is the opposite of what Trooper Villeneuve does?
14  A  Well, they stop more and Trooper Villeneuve's is
15      effectively equal at day or night.  It's not exactly, but
16      it's quite close.
17  Q  Well, are you assigning an error ratio that's like .4?  I
18      understand you are saying they are close, but they are not
19      the same.  Are you assigning an error rate of .4 percent?
20  A  I am saying they are close, but they are not the same.
21  Q  So, am I correct in saying that Trooper Villeneuve has the
22      opposite behavior of the remaining troopers in that she
23      stops more African-Americans during the day than at night,
24      whereas most other troopers stop more African-Americans
25      during the night and less in the day?

Page 68

1   A  I think I'll stand by what I say, which is that Trooper
2       Villeneuve stops approximately the same percentage, just
3       slightly higher percentage during the day, and -- yes, I
4       said that right -- and that other troopers stop a higher
5       percentage at night.
6   Q  Do you find any significance with the fact that she stops
7       the, same in your view, at night as she does in the day?
8   A  Yes, possibly.  One of the suggestions in the WSU report
9       was that it's hard to, harder to identify race at night
10      when you are making a traffic stop.  So that if you were
11      intentionally -- again I shouldn't really use the word
12      intentionally.  If you were, well, maybe intentionally is
13      okay here -- trying to stop more African-Americans, you
14      would expect to see some kind of noticeable difference
15      between the day and night behavior.  And there really
16      isn't a noticeable difference here for Trooper Villeneuve.
17  Q  But you'd agree there is a difference for the other
18      troopers and it goes counter to that whole logic; they are
19      stopping more African-Americans at night when presumably
20      it would be harder to see them?  Is that right?
21  A  They are stopping more at night where it's presumably
22      harder to see them.
23  Q  What sort of inference do you draw from that?
24  A  There are two possibilities which could explain that.  One
25      possibility is that there are, where these other troopers

Page 69

1       are, a different percentage of drivers of different races
2       in day versus night.  That's a possibility.
3           The other is that they are afraid that somebody is
4       going to give them some kind of frivolous suit and so that
5       they are intentionally, when they can tell the difference,
6       not stopping African-Americans.  Those are both
7       speculations only.
8   Q  Is it possible that somebody would bring some kind of
9       nonfrivolous suit that they'd be afraid of, or is it just
10      frivolous suits?
11  A  Oh, I -- well, if we're asking about the question of them
12      doing it, I suppose if somebody were intentionally,
13      racially biased in doing this, I guess they could be
14      trying to hide their behavior, although that calls for
15      them being pretty clever.  So, I guess there's certainly a
16      possibility there could be nonfrivolous suits as well.
17  Q  And how did the behavior of Trooper Villeneuve's stops of
18      Caucasians vary between night and day?
19  A  Let's see.  She stopped during the night, 59.9 percent of
20      her stops were Caucasian, and -- I'm sorry did I say that
21      right?  At night.  And during the day they were 64.7.
22  Q  Can you draw any inference from that fact?
23  A  Well, let me say I don't know whether those are, whether
24      that's a big enough gap to be statistically significant,
25      although it may be; I actually just don't know.

18 (Pages 66 to 69)

Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

| Page 86 | Page 88 |
|---|---|

Page 86

1  which those are.
2  Q  Okay.  Do you draw a conclusion that it is less likely
3     that an African-American trooper would discriminate on the
4     basis of race against an African-American driver than a
5     Caucasian trooper would?
6  A  You can't draw that conclusion from this data --
7  Q  Okay.
8  A  -- either way.
9  Q  So why would you consider as one of the three possible
10     explanations that African-American troopers -- why it
11     matters that there are African-American troopers who stop
12     African-American drivers at a higher rate than Caucasian
13     troopers do?
14  A  Are you asking why it matters to the issue of Trooper
15     Villeneuve?
16  Q  Yes.
17  A  Oh.
18  Q  Isn't your assumption that they are less likely to do
19     that?
20  A  The issue is that I think most people would feel, and I
21     would probably share the assumption, that probably
22     African-American drivers (sic) are not likely to be in a
23     discriminating way targeting African-American drivers.
24  Q  I think you said drivers twice.
25  A  That African-American troopers are less likely to -- no, I

Page 87

1  better not say "less".
2        Well, probably most of us, including me, would be
3     surprised to find that African-American troopers are
4     especially hard on African-American drivers.  It is
5     certainly a possibility, but I think it would be
6     relatively surprising.  But the point of this comparison
7     is that the report that Dr. Guest did follows a
8     statistical method and then it seemed to me that this was
9     being, well, I think the word "designed" was used
10     somewhere.  So it was suggested that this was evidence
11     that Trooper Villeneuve was, my word, prejudiced, not his
12     word.  And what I was trying to say is, well, if you
13     follow the same procedure and you follow the same logic,
14     you would appear to have to say that African-American
15     troopers, not a particular one, but on average are
16     prejudiced against African-Americans.  And that's not
17     impossible, but it doesn't seem likely.
18  Q  And is that a common sense conclusion?
19  A  I think that was intended as a common sense conclusion;
20     yes.
21  Q  Do you have any studies that you can point to,
22     sociological or other studies, that support your
23     conclusion?
24  A  No.
25  Q  Have you read any such studies?

Page 88

1  A  Not that I can bring to mind at the moment.
2  Q  The papers that I've looked at -- strike that.
3        How many papers, published papers that you've written
4     or identified in your vitae do you believe relate to
5     issues of race?  I counted three; does that sound right to
6     you?
7  A  I'll have to take a look at it.
8  Q  That's fine.
9  A  To do that I have to find my vitae.
10  Q  It's attached --
11  A  It's not attached to this exhibit.
12  Q  That's fine.  Just a minute, I'll get you a copy.
13  A  If you have a copy, then maybe if it would help I could
14     just identify which ones.
15  Q  That would be great.
16  A  Thank you.
17        MR. TRIESCH:  Do you want to make it an exhibit or
18     not?
19        MR. WING:  Yeah, let's make it an exhibit.
20        (Exhibit No. 5 marked for identification.)
21  A  The paper "Inequality and Race:  Models and Policy" deals
22     with race.
23  Q  Can you say what page you are on?
24  A  I'm sorry.  I'm on Page 17.  The --
25  Q  I'm sorry.  With your wife; is that correct?

Page 89

1  A  Yes, it was.
2        "On the Persistence of Racial Inequality", also
3     written with my wife, deals with race.  "Private
4     Discrimination and Social Intervention in Competitive
5     Labor Markets", written with my wife, deals with race.
6     That's on Page 18.
7  Q  Thank you.
8  A  "Race", this is on Page 20, "Race, Information, and
9     Segregation", written with my wife, also deals with race.
10  Q  That's under the head "Working Papers"?
11  A  Yes.
12  Q  What does that refer to?
13  A  It's a paper that we've written that is not yet published.
14     I have my fingers crossed, however.
15        We are on Page 22, I think this is responsive, but you
16     can ignore it I guess if it's not.  The thing marked,
17     "Brown v. Board didn't fix everything", this is an op-ed
18     piece.
19  Q  In the newspaper?
20  A  In the newspaper, yeah, which is based on race.
21        On Page 23, there is another op-ed piece, "How Seattle
22     can move on schools and race."
23  Q  Thank you.
24  A  Sure.
25  Q  These papers seem to be reviews of previous literature and

23 (Pages 86 to 89)

11a

Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

Page 118

1   A  This was again one of these research issues of how many
2      different things could you consider.  There's always an
3      infinite set.
4   Q  Well, without controlling for the geographic location,
5      what can you really conclude?
6   A  That on average African-American officers stopped twice
7      the proportion of African-Americans than white officers
8      do.
9   Q  Well, it might simply be they work in areas where there's
10     a larger number of African-Americans driving by; is that
11     correct?
12  A  Exactly, I think you got the point just right.  In this
13     case, as in the case with the test on Trooper Villeneuve,
14     there are other variables that might turn out to be the
15     explanation.  And some of these have been tested in some
16     places and others haven't.  And some we don't have the
17     data to test, but so that basically, yeah, it's the same
18     situation.
19  Q  Okay.  Paragraph 15 of your report --
20  A  Yes.
21  Q  -- you find that African-American troopers compared to
22     Caucasian troopers in APA 5 stop a slightly higher
23     percentage of African-Americans, around 8.7 to 8.0
24     percent?
25  A  8.7 to 8.0; correct.

Page 119

1   Q  You then perform a chi-square test on a table that also
2      includes stops of, quote, "other races" besides whites and
3      African-Americans, and you find that the patterns in the
4      table are statistically significant; is that right?
5   A  That's right.
6   Q  Since this table involves three groups, how do you know
7      which of the comparisons is producing the statistically
8      significant chi-square?
9   A  Is it okay if I look at Dr. Guest's report?
10  Q  Anything you want.
11  A  Thank you.
12  Q  Except my notes.
13  A  That's quite fair.  What I was doing here was trying where
14     possible, where reasonable to follow the same pattern that
15     Professor Guest had used.  And I guess his paragraph, I
16     guess it's Paragraph B of his report it's labeled, Page
17     14, where he did a comparison of other officers versus
18     Trooper Villeneuve on, those are the two different rows; I
19     did African-Americans versus Caucasians, two different
20     rows.  He then had the columns white, African-American and
21     and other race.  And because he did that, I included those
22     same races.  And I think, unless I screwed something up,
23     that I basically did the exact same test that he
24     described, which is checking whether there's independence
25     between who did the stops and between the race that was

Page 120

1      stopped.
2   Q  Well, let that's not my question.
3   A  I'm sorry.
4         MR. WING:  Do you want to read back my question?
5         (The last question was read back.)
6   A  Well, I'm trying to -- I'm pausing because I'm trying to
7      figure out if there is a way from looking at this to
8      answer that perfectly reasonable question.  Because the
9      test, the explicit test that was done is certainly, as is
10     my understanding of Professor Guest asking about all of
11     the races, not just white versus African-American.
12        So the thing which I'm trying to figure out in my own
13     mind is if you can actually answer that question because
14     of the ordering of the percentages of other race.  But
15     since we don't want to sit here while I spend the next
16     hour trying to figure this out in my head, if it's a
17     satisfactory answer, the test I did did not distinguish
18     whether it was all three races or just the two.
19  Q  Okay.  So is it correct to say you can't tell which of the
20     comparisons produces the statistically significant
21     chi-square from your Paragraph 15?
22  A  It is correct to say that from -- well, my Paragraph 15
23     reports a test that does not distinguish which of them it
24     is.  I'm not sure whether simply from looking at the
25     information on the table one could nonetheless figure out

Page 121

1      what would happen if you did confine it to all three
2      races, that wasn't what was done.  And I'm just not
3      sure -- you ask could one figure, and I don't know the
4      answer as to whether one could or not.
5   Q  Okay.  Paragraph 15, let's see, you conclude --
6         MR. TRIESCH:  Are you referring to Exhibit 1?
7   Q  In your report, so I guess that's Exhibit 1.
8   A  Uh-huh.
9   Q  You wrote, "If one were to interpret the statistical
10     evidence as indication that Trooper Villeneuve stops a
11     greater proportion of African-Americans 'by design', it
12     would appear one would have to reach same conclusion with
13     regard to the 'design' of African-American troopers";
14     right?
15  A  That's what I wrote.
16  Q  Okay.  If your presentation of the data in Paragraph 15
17     does not answer the question of which comparison produces
18     the statistically significant chi-square, how can you
19     reach that conclusion?
20  A  Well, if I understand -- and I'm really not trying to be
21     rude here -- if I understand the argument you are making,
22     you are saying that the analysis that I did in this
23     paragraph and that the analysis that Professor Guest did
24     in Paragraph B, C, D, E, possibly just those, I'm not
25     going to, we don't need me to keep going through this, but

31 (Pages 118 to 121)

12

Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

Page 122

1 there are some others.  If you are saying they are all
2 inappropriate or irrelevant, I guess you could make that
3 argument.  But let me --
4 Q  That's not my question.
5 A  Well, okay.  Let me continue and I'll try to answer.
6      What is said here and what would be more accurate is
7 if it were to say if one were to interpret the statistical
8 evidence to indicate that Trooper Villeneuve's
9 differential stopping rates by race were by design it
10 would appear one would have to reach the same conclusion
11 with regard to the design of African-American troopers.
12      So, a good point actually, that if you want to label
13 it only African-American, you shouldn't have three races;
14 yeah, I guess that's three races in there.  And so that
15 that would be more accurate if it said by race rather than
16 specifically African-Americans.  And that's, from my
17 understanding, what Pete did, but, of course, that would
18 apply to his as well.  And it would -- if Pete and I were
19 off doing a scientific thing together, we would then
20 probably go back and say, okay, let's go do all these sort
21 of differently, just having the two categories.  It's a
22 good scientific point.
23 Q  In your Paragraph 15, you note the percentage difference
24 between 8.7 percent to 8.0 percent.  What is the
25 difference?

Page 123

1 A  You are referring to what's in the table?
2 Q  Yeah.
3 A  Okay.  Because the table appears on Page 8.
4 Q  Yeah.
5 A  Yes.
6 Q  And what is the percentage difference that Dr. Guest
7    notes?
8 A  If I understand the reference you are asking for is the
9    12.7 versus the 7.9?
10 Q  Okay.
11 A  Yeah.
12 Q  And you, as I understand it, are comparing in your report,
13    Paragraph 15, that one would have to reach the same
14    conclusion with regard to the 8.0 to 8.7 percent
15    differential as Dr. Guest reaches when comparing 12.7
16    percent and 7.9 percent.  Is that not somewhat of an
17    exaggeration?  There is quite a difference between those
18    comparisons, isn't there?
19 A  Well, what I said was, that I was quoting Professor Guest,
20    quote, "The likelihood this distribution is by chance is
21    remote; it is less than one out of one-thousand, which is
22    highly statistically significant."
23       If one were to interpret the statistical evidence, and
24    I certainly mentioned statistical significance here, then
25    one would reach the same conclusion.  So this was a

Page 124

1 statement with regard to the statistical significance.
2 Q  Okay.  Would you agree that the substantive or importance
3 of the difference between the 8.7 percent to the 8.0
4 percent is quite less than 7.9 percent to 12.7 percent
5 noted in Professor Guest's report.
6 A  I agree they are different.
7 Q  And how would you characterize the nature or extent of the
8 difference?
9 A  There is more of a difference between Trooper Villeneuve's
10 stops in this statistic we're looking at, and the average
11 trooper stop than there is in the difference of
12 African-American trooper average versus Caucasian trooper
13 average.
14 Q  And I understand you say there's more.  What adjective
15 would be place in front of the word "more" to describe
16 whether it was trivial, significant, substantial,
17 dramatic?  You pick your own.
18 A  I think if had I wanted to pick an adjective, I probably
19 would have.  I think that -- let me tell you why I'm
20 hesitating a little bit.  There is a difference between
21 the two comparisons, which is in the work that Professor
22 Guest did were comparing individual compared to an
23 average.
24      In the work that I did, I'm comparing two averages.
25 Now, on average an individual has the average behavior.

Page 125

1 But when you are looking at individuals, you expect to see
2 more dispersed, or I should say, greater variation in
3 outcomes than when you are looking at averages because
4 exactly what averages do is they tend to lop off the
5 difference.
6      So if you were to give me two different groups with a
7 moderate number of people, one case what was roughly 8
8 percent, 8.7 percent, and the other case was roughly 8
9 versus 12 something.  And I'd say that's enough to
10 certainly be noticeable.  One would certainly want to pay
11 attention to that.  When one of the comparisons is only an
12 individual then -- I know I use the word "important".  The
13 whole topic is clearly important; maybe large or
14 substantively large would be better -- but it's less of a
15 difference in that context.  It is still, I want to be
16 very clear, I think that looking at that number one wants
17 to look and say, Well, they are different; why?
18      Does that get you an answer?  I think it's the best I
19 can do.
20 Q  I think you said in your final report that there could be
21 data that would extend the data set that you might look
22 at.  This is Paragraph 6.  What did you mean by that?
23 A  I know that there exists data for other time periods than
24 was covered in this, and so one could possibly look at
25 that.

32 (Pages 122 to 125)

13

Page 130

1  rule it out.  We're talking about getting more or less
2  weight of the evidence rather than ruling things out.
3  That would certainly be one thing that one could do.
4       The other thing is that -- well, I don't know if I
5  should be embarrassed, but you don't know what the date of
6  the suit was or when anybody found out anything.
7  Q  Sure.
8  A  And so I might have some data, and what's more, I assume
9  that somebody actually in fairness can know a suit is
10  coming before it comes.  I just don't know exactly how the
11  details work.  You might get some more data that people
12  would reasonably agree was not tainted.  You might get
13  other data where people would quite fairly be more
14  concerned about whether it may have been tainted.
15  Q  Okay.  You address in Paragraph 16 the issue, of your
16  report, of the daylight versus nighttime stops?
17  A  Yes, I did.
18  Q  Okay.  Do you remember that issue?
19  A  Yes.
20  Q  Okay.  Did you make some assumptions that when accepting
21  the WSU designation of 7 a.m. to 7 p.m. and 7 p.m. to 7
22  a.m. that that time frame was a reasonable basis for
23  distinguishing between when a trooper could reasonably see
24  the driver?
25  A  What I did, which is sort of standard scientific practice,

Page 131

1  is if there's an existing literature, you try to change as
2  few factors as you can manage.  And so was, I'm not sure
3  I'd want to accept the words making a judgment that it was
4  reasonable; it was simply saying these people seemed to
5  know what they were doing.  Unless I've got a good reason
6  to the contrary, I'll just continue on with what they had
7  done.  And I guess my impression, and I'm sure I'll be
8  corrected at some point if I'm wrong here, is that when
9  Professor Guest did it, I thought that he was following,
10  basically trying to follow that model as well.  So -- and
11  I guess I should have a more firm answer, but I'll find
12  out if I'm saying it wrong.
13  Q  Well, for example, you would agree, wouldn't you, that for
14  at least part of the year it's quite possible to see
15  people driving in their cars past 7:00 at night?
16  A  Yes, I would.
17  Q  Would you also agree that it's certainly possible during
18  maybe even significant portions of the year not to be able
19  to see people when they are driving their car at 8:00 in
20  the morning?
21  A  I'm trying to remember since I get up earlier than that
22  what time do my eyes open.  But if it would help, I am
23  happy to agree that using seven a.m. and seven p.m. as
24  arbitrary cutoff days introduce some error into when
25  people can be seen.

Page 132

1  Q  And would you also agree that there did not appear to be
2  any specific data in the WSU report that explained why
3  they believed on well lit highways a trooper would be
4  unable to see the race of a driver?
5  A  You know, I am not sure, I may be agreeing.  I'm not sure,
6  I don't remember them saying anything about "unable to
7  see".  I think that they were trying to, that their
8  suggestion was that there would be an important, in some
9  sense, substantive difference in how often you could see.
10  But having said that, I mean, that's a factual question as
11  to what they said in the survey, in their study, but I
12  don't remember them saying why they picked those times.
13  Q  Well, apart from what you may have read in the WSU report,
14  do you have any separate data or studies that you rely
15  upon in concluding that it would be more likely the
16  troopers would be able to identify race at night and
17  during the daytime?
18  A  Other than Professor Guest had sort of looked at the same
19  question, no, I don't have any independent --
20       MR. TRIESCH:  Give me a minute?
21       MR. WING:  Sure.
22       (Off the record discussion.)
23  BY MR. WING:
24  Q  Do you believe that at least some troopers in the State of
25  Washington make race-based decisions on who to stop?

Page 133

1       MR. TRIESCH:  Objection; calls for speculation.
2  A  I don't have the slightest knowledge about whether
3  troopers in the State of Washington, individual troopers
4  make race-based stops, but I am completely happy to say
5  that given there are a large number of them, I would be
6  surprised as hell if there wasn't somebody who was acting
7  out of prejudice.
8  Q  Okay.  To determine whether a particular trooper was
9  engaged in such behavior, would you go through a different
10  analysis than Dr. Guest did?
11  A  Yes.
12  Q  What would you do?
13  A  Well, I would actually say I might very well begin with
14  exactly what Dr. Guest did.  One of the things that
15  statistical analysis can be very useful for is to give you
16  a quick and inexpensive screen.
17       I would then, however, want to do two other things.
18  The first is the one we sort of talked about a number of
19  times which asks can we, is there an explanation in the
20  statistics or otherwise which would -- I'm sorry.
21  Assuming we identify a trooper, ten troopers or whatever
22  who have a higher than average number of stops by race or
23  gender or whatever.  I'd want to ask if there's some
24  covariant that actually explains that.
25       The second thing I would want to do is I would then

34 (Pages 130 to 133)

14

Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

Page 134

1  say, okay -- suppose you did not find that after you
2  conducted a thorough investigation.  I would say, okay,
3  there is a reason to be, to have some suspicion as to what
4  is going on here.  And that the point I think I would try
5  to look for evidence than statistical evidence.  I
6  would be very -- given that we can't do a perfect job of
7  explaining all of these covariates, I think that it is
8  sensible to use these things to raise questions, to call
9  for further investigation.  I would be very hesitant in
10  looking at individual troopers to make any kind of final
11  conclusion.
12      If we were looking at large groups of troopers where
13  there was more clear reason to believe that unobserved
14  covariates were unlikely to differ on average, I would go
15  further.  So I think there's some difference, and there's
16  always a judgment call involved in how much weight you
17  want to put on statistical evidence in cases involving
18  groups versus trying to identify an individual.
19  Q  Do you believe that Dr. Guest's report raises a concern in
20  your mind that Trooper Villeneuve may be making stops
21  based on the race of individual drivers?
22  A  Very much saying does it raise a concern?  Yes.
23  Q  Do you believe that that concern has been resolved by the
24  data presented in your report?
25  A  No.

Page 135

1  Q  I asked you whether you thought there may be stops by
2  troopers based on race in this state, and you said you
3  thought, in part, you'd have to treat the analysis of it,
4  uncovering behavior of an individual versus a group.  And
5  I may have missed it in what you said, but what's the
6  difference in how you would treat them?
7  A  I would put much more weight on purely statistical
8  evidence which compared groups rather than an individual
9  to a group.  Is that responsive or not?
10  Q  Well, I think so.  If you said it, I apologize, but I
11  don't understand why.
12  A  Oh, okay.  And I'm not sure whether I -- I don't know if I
13  said it before.  Let my try to say it now.  There are two
14  separate statistical issues.  One is that because
15  averages - oh, this is going to sound dumb - because they
16  are in the middle, they are much less likely to randomly
17  be -- two different averages are much less likely to be
18  randomly far apart than an average and an individual
19  observation.  So that's one of the reasons.
20      The other, which I think is more important and
21  certainly probably more relevant I think in this case, is
22  that there is in any statistical analysis, the issue of
23  what we would call the unobserved covariates, where what a
24  scientist, statistician does is say, well, what are the
25  factors that are left out that we don't have numerical

Page 136

1  answers for; can we think about how they would affect the
2  analysis.
3      When you are looking at comparing groups, not in every
4  case, but in general you have a better shot at being able
5  to reasonably believe that the unobserved covariates are
6  likely to wash out across two groups.  You have a better
7  shot there than you do of a group versus one individual.
8  So those are the, I think, the two main reasons.
9  Q  Okay.  Why don't I just go through and do this hopefully
10  as rapidly as we can?
11  A  My baby took herself home, so I'm okay.
12  Q  If you'd please turn to Professor Guest's report.
13  A  This is Exhibit --
14  Q  Exhibit 6?
15  A  -- Exhibit 6; yes.
16      MR. TRIESCH:  Now, I don't know --
17      MR. WING:  Didn't I give you a copy?
18      MR. TRIESCH:  I don't believe so.
19      MR. WING:  Oh, you know what, here you go.
20  BY MR. WING:
21  Q  Section A?
22  A  Do you know what page number?
23  Q  7.
24  A  Thank you.  Yes.
25  Q  Do you believe that all of your criticisms, if any,

Page 137

1  regarding Section A are contained in your final report?
2  And let me put this another way.
3  A  Yes.
4  Q  You can see, I'd like to go through these section by
5  section.
6  A  Sure.
7  Q  And I don't have a need to have you repeat everything that
8  we've said earlier today.
9  A  That's fine.
10  Q  Okay.  But my point is I'd like to hear any criticisms
11  that you have.  And you can say, "We're discussed this
12  earlier today" or "it's in report number" whatever.
13  A  That's fine.
14  Q  Okay.
15  A  In regard to -- I want to make sure everything he said in
16  Paragraph A.
17  Q  Sure.
18  A  I don't understand why Professor Guest picked the numbers
19  500 and 100.  There's nothing necessarily wrong with those
20  numbers.  I would like to know that.  But the
21  basic, just what he says in A, other than what I've said
22  in other places or whatever, I don't have anything

SHERRI DEWITT, CCR
(206) 617-3415

15

C E R T I F I C A T E

STATE OF WASHINGTON   )

COUNTY OF KING        )

1        I, SHERRI DEWITT, Notary Public in and for the

State of Washington do hereby certify;

The foregoing deposition was taken before me at the

time and place set forth;

The witness was by me first duly sworn to testify the

truth; and the testimony of the witness and all objections

made at the time of the examination were recorded

stenographically by me, and thereafter transcribed by

myself;

The foregoing transcript is a true record of the

testimony of the witness and of all objections made at the

time of the examination, to the best of my ability.  I

further certify that I am in no way related to the parties

or counsel in the action, nor do I have an interest in the

matter;

WITNESS my hand and Seal this 10th day of October,

2005.

NOTARY PUBLIC in and for the State of

Washington, at North Bend.  My Commission

expires 5/26/06.

16

Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

Page 175

1                           C O R R E C T I O N S

2        Please make all corrections, changes, or clarifications to

         your testimony on this sheet, showing page and line number

3        and the nature of the change.  If there are no changes,

         write "None" across the page.  Sign this sheet and the

4        declaration of signature page, and return the signed

         corrections and declaration of signature within 30 days to

5        SHERRI DEWITT at the address below for filing with the

         clerk of the court.

6

7        PAGE      LINE        CORRECTION AND REASON

8         24        23         staple - spelling

9         40         6         past - spelling

10        65        10         a priori [not "or priority"]

11       100        11         car - not care

12       135        13         me - not my

13

14

15

16

17

18

19

20

21

22

23

24                            _____

25                            RICHARD STARTZ, Ph.D.

17

Lacy v Villeneuve   10-7-05   RICHARD STARTZ, Ph.D.

Page 176

1         D E C L A R A T I O N   O F   S I G N A T U R E

2

3    STATE OF WASHINGTON )

4    COUNTY OF                    )

5

6         I have read the foregoing transcript, and declare

7    under penalty of perjury that the same is true and

8    accurate, save and except for any changes and/or

9    corrections, if any, as indicated by me on the

10   "Corrections" sheet hereof.

11

12

13

14   _____

15         RICHARD STARTZ, Ph.D., The Witness

16

17

18

19

20   EXECUTED AT _Seattle_____, Washington, this _17_,

21   day of _October_____, 20_05_.

22                          State of Washington, County of _King_____

23                          I certify that I know or have satisfactory evidence that
                            _Richard Startz_____ is the person who appeared before me,
24                          and said person acknowledged that he/she signed this instrument and
                            acknowledged it to be his/her free and voluntary act for the uses and
                            purposes mentioned in the instrument.
25                          Dated this _17th_ day of _October_____, 20_05_.
                            _Mary L Taylor_____
                            Notary Public        My appointment expires _12/01/07_

# EXHIBIT

# 2

19

Page 178

1       UNITED STATES DISTRICT COURT OF THE STATE OF WASHINGTON

2                    WESTERN DISTRICT AT SEATTLE

3  _____

4  SHIRLEY M. LACY,                    )
                                        )
5                    Plaintiff,         )
                                        )
6            vs                         )NO. CV03-2442-P
                                        )
7  KAREN VILLENEUVE,                    )
                                        )
8                    Defendant.         )

9  _____

10           DEPOSITION UPON ORAL EXAMINATION OF

11                 RICHARD STARTZ, Ph.D.

12                       (Volume II)

13  _____

14                    9:00 o'clock a.m.

15                   December 8, 2005

16                University of Washington

17              Room 239C, Gerberding Hall

18                 Seattle, Washington

19

20

21

22

23

24  SHERRI DEWITT, CCR #29906

25  Court Reporter

20

Page 215

1  Q  I read your entry on Exhibit 4, 8-29-2005 for three hours
2      and 20 minutes to apply to, "Read Gullberg faxes. Look at
3      Gullberg data. Seat belt stops. Call Triesch." And then
4      8-30-2005 for one hour 55 minutes to apply to -- excuse
5      me. That's the one hour and 55 minutes is the, "Read
6      Gullberg fax" and all that.
7          MR. TRIESCH:  Object to the form.
8  BY MR. WING:
9  Q  Now, what I want to ask you is do you -- let's make this a
10      separate question.
11      You included in that line entry seat belt stops.
12      Did that idea for investigating statistical data regarding
13      seat belt stops come from the Gullberg data or the
14      Gullberg faxes?
15  A  I don't remember.
16  Q  Did that come from Mr. Triesch?
17  A  It may have.
18  Q  Did you also consider running statistical analysis
19      specifically regarding stops for the HOV lane?
20  A  I believe that I did; yes.
21  Q  And what was your -- did you actually run such
22      evaluations?
23  A  I believe I did some work on that; yes.
24  Q  What did you find?
25  A  I don't know if it was covered in any of the reports that

Page 216

1      I sent in, but without going back and looking through
2      those, I don't remember.
3  Q  Do you have records of all the statistical runs that you
4      made?
5  A  No.
6  Q  What did you do with those runs that you made that you
7      don't have a copy of?
8          MR. TRIESCH:  You can answer the question, but I'm
9      going to lodge an objection again. I've been giving you
10      wide latitude on this and you are going, I think, beyond
11      Judge Robart's order, which was that this deposition is
12      limited to inquiry about your conversations with defense
13      counsel.
14          MR. WING:  That would be part of this. I understand
15      your objection.
16  BY MR. WING:
17  Q  Go ahead.
18  A  These things all appear on a computer screen. If you
19      don't save them or do something to print them out, they
20      disappear into whatever electrons go or whatever.
21  Q  Did you have a discussion with Mr. Triesch at any point
22      about what work you would save?
23  A  No.
24  Q  Did you have a discussion with him at any point about what
25      data, working notes, you might be required to produce in

Page 217

1      the form of discovery during the course of discovery to my
2      office?
3  A  Probably in two cases; yes. At some point I'm sure that I
4      said to him, "Different attorneys have different
5      procedures they like to follow about how much is done
6      verbally, how much is done in writing and so forth. Do
7      you have any strong feelings?" And I think his response
8      was no, that he wasn't concerned.
9          And then in response, well, I guess in response to
10      your subpoena, at some point I asked him to take a look at
11      some of my material and ask what parts of this was
12      responsive and what wasn't and give me sort of the
13      appropriate guidance since I didn't understand what the
14      legal issues were. The response was always, "We don't
15      have anything to hide."
16  Q  So I think you testified that you ran some data on the HOV
17      lane but you no longer have it; is that correct?
18  A  No. I said I don't remember. I don't believe -- let
19      me -- maybe I can help, though.
20      I'm pretty sure that any results which I kept records
21      of, I'm pretty sure appeared in the reports. I'm trying
22      to remember if there was also one set of working notes.
23      But there aren't other files that have been printed out or
24      anything like that, but I don't remember what's in the
25      things that have been turned over.

Page 218

1  Q  Do you think somewhere, either on paper or on computer
2      file, is a copy of all of your data runs that ended up
3      being in your final report?
4  A  No.
5  Q  Is there some reason you would not save the data runs that
6      are actually contained in your final report, the one you
7      signed?
8  A  Yes. The data runs and, of course, now these days, they
9      are on computer screen, come out in a format where they
10      show what all the different statistical information is.
11      And I think it's quite likely that in some cases I copied
12      and pasted to, appropriate pieces of that into Microsoft
13      Word, and having done that, I would not, I mean, I might
14      save an actual copy of the display or I might not.
15  Q  Okay. Is it fair to say that any of the statistical runs
16      that you made that did not appear in any of your
17      individual reports or opinion letters or final report, you
18      did not consider to be relevant or add anything to your
19      analysis of this case?
20      Do you want me to rephrase that?
21  A  Thank you.
22  Q  Okay. Sure. There are some data runs that you performed
23      that are not found in any of your written work; is that
24      correct?
25  A  Yes, it is.

11 (Pages 215 to 218)

21

Lacy v Villeneuve 12-8-05  RICHARD STARTZ, Vol. 2

Page 219

1   Q  Okay.  For what reason did you not include those data runs
2       in your written work?
3   A  I didn't include them because I didn't think they
4       contributed anything to understanding of the case or to my
5       opinion.
6           (Exhibit No. 11 marked for identification.)
7   Q  Now, I'm going to hand you what's marked as Exhibit 11.
8           MR. TRIESCH:  Is it a new exhibit?
9           MR. WING:  It is.
10  Q  Have you had an opportunity to look at that?
11  A  I haven't read through all of it carefully, but I've
12      quickly scanned it.
13  Q  Okay.  I'll represent to you that the second page, which
14      identifies a privilege log and then a number of documents
15      that are not being produced for that basis, is followed by
16      all the documents that were sent to us by Mr. Triesch
17      accompanying his October 21, 2005 letter, okay.
18  A  I understand.
19  Q  Okay.  There are some documents in here, if you look at
20      the very last page, which look like your notes?
21  A  They are.
22  Q  They are?
23  A  Yes, they are.
24  Q  Okay.  The last page says near the top, "I was
25      supplied" -- do you see that?

Page 220

1   A  I do.
2   Q  Okay.  And then the following sentence -- strike that.  It
3       says, "I was supplied (via AG's office) faxes from
4       Sergeant Rod Gullberg as well as a file APA6.sav described
5       as 'Attached is the SPSS data file for APA 6 from January
6       2004 to April 2005'"; do you see that?
7   A  Yes, I do.
8   Q  Okay.  Does that refresh your recollection at all about
9       the kind of data that you were provided by Sergeant
10      Gullberg?
11  A  Yes, it does.  Thank you.
12  Q  What can you tell me about this, having read this?
13  A  That that was an SPSS file and that it contained data.
14      And, again, I do believe, as we discussed earlier, I think
15      it was certainly similar to the Washington State
16      University study.  I don't remember the source.
17          The work that Professor Guest did that I've also
18      examined for APA 5, which is where the stop was.  And my
19      memory is that at some later date that Trooper Villeneuve
20      was working APA 6, and this is data covering a later data
21      period and for APA 6.
22  Q  What is the significance of the tabulation that is listed
23      on this page?
24  A  If it's okay, can I just walk through with you the
25      whole --

Page 221

1   Q  Please.
2   A  Sure.  This is a note to myself that having looked up
3       somewhere, there wasn't a good data dictionary for this
4       stuff that violation codes were 174 for seat belts and 175
5       for HOV lanes.  There's the question, there was a
6       question, was Trooper Villeneuve accurately identified in
7       the data.  And I think this next note says -- because
8       there are no names of troopers in the data -- that I think
9       that number is for, yeah, that number is for Trooper
10      Villeneuve.  And whether -- and that a date, it matches
11      roughly, I guess it's her date of service or something
12      like that.  So it probably means it's the right
13      identification.
14          So what I did then was I created a new variable called
15      belt stop.  There was, I believe, eight possible places to
16      write down a violation, and I was asking if any of them
17      had been for a seat belt stop.  Then this is a tabulation
18      and it looks at Trooper Villeneuve's stops and stops by
19      people other than -- the top is stops that are not by
20      Trooper Villeneuve, the next set below is stops that are
21      by Trooper Villeneuve and asks whether they were seat belt
22      stops or not.
23  Q  And for what geographic area does this cross-tabulation
24      cover?
25  A  I don't know, but I believe it's APA 5.

Page 222

1   Q  Okay.  Not APA 6?
2   A  I don't think so.  I'm not -- I'm actually pretty sure
3       that it's not APA 6, but I'm not positive.  I can't tell
4       from reading this.
5   Q  And what does the cross-tabulation on this final page of
6       Exhibit 11 show you?
7   A  That Trooper Villeneuve, about nine percent of her
8       stops -- I'm sorry.  I haven't looked at this table in a
9       long time, since actually roughly 8-30.
10          MR. TRIESCH:  You mean August 30th for the record
11      and not the time 8:30?
12          THE WITNESS:  Yes.
13          MR. WING:  Thank you.
14  A  Yes.  That I think what this is saying is about nine
15      percent of Trooper Villeneuve's stops involved a seat belt
16      stop compared to about 4.8 percent for other troopers.  So
17      I think that's what it says.
18  Q  Why did you run this cross-tabulation?
19  A  At some point my memory is that Mr. Triesch told me that
20      she was particularly aggressive on seat belt stops, and I
21      looked at this and said, "Well, on the surface that
22      appears to be true."
23  Q  Why does that matter?
24  A  Well, that's in the academic sense a good question.  Why
25      does that matter?  I don't remember whether this was

12 (Pages 219 to 222)

22

Page 223

1  simply telling him that the information was right or
2  whether it might be thought to have some other bearing on
3  the case otherwise.
4  Q  Did you run a similar cross-tabulation regarding HOV
5     violations?
6  A  Huh.  I think I did.
7  Q  For what purpose?
8  A  One of the questions being asking was whether there are
9     variables other than race that would do some kind of
10    accounting for the difference that Professor Guest found
11    was that different groups might have different behaviors
12    on any of some large number of dimensions.  It might be --
13    I mean, in this case, different racial groups, I guess,
14    might be less likely to wear seat belts or they might be
15    more or less likely to be violating the HOV or any of a
16    number of things or they might not.
17       Well, what would be relevant is, I suppose
18    African-Americans since that's the question here, are more
19    commonly than whites let's say failing to wear seat belts.
20    I don't know whether that's true or not.  There's some
21    discussion about some of these things in the Washington
22    State University report, but I don't at the time remember
23    what they said.  And suppose it also happens that
24    Professor, that Trooper Villeneuve was usually aggressive
25    about seat belt stops.  Then it might be true as a result

Page 224

1  of that that essentially just by coincidence she was
2  stopping more black motorists, and the same would be true
3  of HOV.  So looking at these things were some part of an
4  exploration of were there other things which gave an
5  obvious accounting for Professor Guest's early finding.
6  Q  Did you test your hypothesis that you just described
7     regarding any tendency of certain racial groups to
8     violate, to commit certain violations in conjunction with
9     Trooper Villeneuve's purported aggressive enforcement of
10    those violations?
11 A  Yeah, I did.  And I'll try to remember what they were.  I
12    don't remember without reading through notes or reports
13    whatever else has been turned over, I don't remember what
14    the conclusions were.
15 Q  Okay.  Well, my question is specifically directed to
16    things that are not in your written reports.
17 A  Well, I'm sure that I looked at some things, and I don't
18    remember what they were, and found, no, they just don't
19    happen to be any different for different racial groups, or
20    that they don't account for things.
21    I have a memory that I in fact looked at HOV stops --
22    and I want to be quite clear, I'm not sure if this is a
23    correct memory -- and that the principal was true, that
24    there were, based on the data that I had, racial
25    differences in HOV violations and that this was something

Page 225

1  that Trooper Villeneuve was more aggressive about and that
2  it accounted in some part, but not very large, for the
3  findings of Professor Guest.
4  Q  Did you discuss that with Mr. Triesch?
5  A  Well, as I've said, I'm not entirely confident about
6     exactly what my memory is, but whatever it was, I did tell
7     him that, yeah, there were some findings in this direction
8     but that I didn't think that they were very strong or
9     relevant.
10       The problem with doing this, and one of my reasons for
11    conversation with Mr. Triesch is we have what Professor
12    Guest found.  The question is, well, is there something
13    obvious that explains this?  I'm not a State trooper.  I
14    don't get a lot of traffic tickets.  I don't really
15    necessarily know what to look for, and there's an infinite
16    set of things one can imagine looking for.  So it's quite
17    appropriate to ask people who are involved do they think
18    there is some obvious thing.  And I suspect that either
19    seat belts or HOV may have come out of some of those
20    conversations.  But I want to be clear, I actually don't
21    remember.  There is some possibility there was mention
22    something about Gullberg.  There's some possibility it was
23    mentioned in the Washington State report.  I don't really
24    remember the source.
25 Q  Do you remember any other suggestions about variables that

Page 226

1  you should look at that were made to you by Mr. Triesch?
2  A  Well, there was never anything I think at the quite
3     specific level of suggesting particular variables, but
4     there was certainly some discussion about geography, but I
5     can't tell you whether it arose from Mr. Triesch or from
6     me simply saying, "Well, are these stops that, if she was
7     assigned to areas that were, you know, much more heavily
8     African-American you wouldn't be surprised that there were
9     more African-American stops.  And what do we know about
10    this?"
11       And I think I can fairly say that I actually think
12    that -- I have very limited information about racial
13    compositions of areas, and I have very limited information
14    really about where Trooper Villeneuve was assigned.  So
15    there's some work that I did based on mile posts where
16    stops were, which I'm sure is included in some of the
17    reports.  From a scientific point of view, it would be
18    nice to have better information, but this was all that was
19    available.
20 Q  Did you include in your final report all data runs and
21    conclusions that you thought were important?
22 A  Yes.  Yes.  Well, let me say, important to explain my
23    opinion and my findings.  I mean, as an example, I did
24    rerun a number of the things that Professor Guest did, and
25    exactly as I expected, I got the same numbers he did.  I

13 (Pages 223 to 226)

23

Page 227

1  don't think I included things like that.
2  Q  Okay.  Did you do any calculations of Trooper Villeneuve's
3     time in APA 6 to determine whether there were relevant or
4     important cross-tabulations?
5  A  I did, I have a memory I did something, I don't remember
6     what it was exactly.  Well, let me be careful.  I'm not
7     sure whether it was -- I'm sure I did something on APA 6
8     and probably at some point said to the Attorney General,
9     "This is something if you would like me to spend the time
10    I can pursue more.  The question you need to think about
11    is do you think this is relevant to the case."  Because my
12    understanding was that her assignments in APA 6 were
13    later, and there would be some argument about whether that
14    was relevant evidence or not.  And I think that's about as
15    far as it went.
16 Q  What did Mr. Triesch tell you when you asked him, "Do you
17    want me to do this and would it be relevant?"
18 A  I'm not sure.  I think he probably said, "Let me think
19    about it", or something like that.  Let me be clear that I
20    did not find anything which I thought was damaging to
21    Trooper Villeneuve's case in looking at that.  So if I
22    had, I would have pushed much harder and said, "Well, you
23    know, this is not appropriate to hide" or whatever the
24    term is.  It's stuff which to me looked to be helpful to
25    her case, but perhaps not really very relevant.  And I

Page 228

1  figure that that's in some sense a judgment as to how much
2  work they want done in that area.
3  Q  Do you remember finding anything that you thought was
4     helpful to Trooper Villeneuve's case in APA 6?
5  A  Well, I have a general memory that some of the racial
6     differences weren't as great, but I don't have any very
7     specific memory.  And I don't know exactly what that's
8     based on because I don't think the racial composition of
9     APA 6 is the same as APA 5.  And, of course, composition
10    is a problem because these are where people are driving
11    and not necessarily where people -- it's not -- I don't
12    know how much data there is on where people drive as
13    opposed to where they live.
14 Q  These pages aren't numbered, so if you'll follow on along
15    we'll move from the back forward.
16 A  Okay.
17 Q  I think it's the fourth page from the back.  It starts at
18    the top, "Notes 2 on Lacy v Villeneuve - Stream of
19    consciousness, not verified", do you see that?
20 A  Yes, I do.
21 Q  Okay.  You wrote in paragraph 1, "It looks like officer is
22    not significant if you also account for mileage post"; is
23    that what you wrote?
24 A  Yes, it is.
25 Q  What did you mean by that?

Page 229

1  A  That if you -- once you account for where the stops took
2     place, then there's not a statistically significant
3     difference according to, I think, the officer there, I
4     assume that refers to, whether it's Trooper Villeneuve or
5     not.
6  Q  Okay.  I'm not sure, could you just say that again?  I may
7     have misunderstood you, but --
8  A  I'll try.
9  Q  Okay.
10 A  I think what that says is that once you take account of
11    the mileage post at which the stop took place for those
12    for which we have that information, then there's not a
13    statistically significant difference in the number of
14    stops or percentage of stops by race for Trooper
15    Villeneuve versus others.  I think that's what it says.
16 Q  At the bottom of that page it lists violation codes for
17    seat belt, HOV violation, DUI and speeds; do you see that?
18 A  I do.
19 Q  Do you believe that you ran cross-tabulations regarding
20    each of those violations?
21 A  No, I don't.
22 Q  Do you know why they are listed there?
23 A  Because I was rummaging through the database and trying to
24    figure out what the codes meant, and when I figured
25    something out, I want to write it down before I forgot it.

Page 230

1  Q  For what purpose were you rummaging around looking for
2     what these codes meant?
3  A  Oh, for the potential question was was there some of these
4     that would account for racial differences.
5  Q  And once you found what the codes meant, how did you
6     intend to use those codes to do just what you said, which
7     was, see if they account for the racial differences?
8  A  Well, I didn't have the intention, I was just trying to
9     write down things as I happened to notice them that I
10    thought might be useful later.
11 Q  Was there some reason why you did not run
12    cross-tabulations regarding seat belt, HOV, DUI and speed?
13 A  I didn't say that I didn't.  I think we see at least some
14    cross-tabulation later on for one of them, for belt stops.
15    I think I ran some, and frankly, the form of the database
16    was painful to work with to try to -- because they were
17    coded in a bunch of different places and I wasn't 100
18    percent sure I understood all of them, it was going to
19    take a lot of work to try out all of the different
20    possible things, and at some point I made the cost benefit
21    judgment that it wasn't worth looking at all the
22    possibilities.  You always have to make that judgment some
23    place.  I'm just saying that in this case it came about
24    here.
25 Q  Were you told at any point by Mr. Triesch or someone from

14 (Pages 227 to 230)

24

Page 271

1  came from Gullberg as we discussed, further data either
2  from a different place or a different time or something,
3  and maybe that's not being responsive.
4      It got in the report because I thought it was
5  appropriate to put that in there because there might be
6  further work that could be done.
7  Q  Was that suggested to you by the Attorney General's
8  Office?
9  A  No.
10 Q  And paragraph 5, the very final sentence reads, "I was
11 also supplied copies of two studies of the Washington
12 State Patrol" -- thank you -- "done by researchers at
13 Washington State University"; is that correct?
14 A  Yes, that's correct.
15 Q  Who provided those to you?
16 A  I think they both came from the Attorney General's Office.
17 Q  Okay.  And they were not in your previous reports; is that
18 correct?  That sentence or a reflection that you reviewed
19 those documents?
20 A  I don't know.  I wouldn't normally tell, the report to the
21 Attorney General what they sent me; I figure that they
22 know.
23 Q  Okay.  Did they suggest that you add that?
24 A  No.
25 Q  Okay.

Page 272

1  A  They -- no, actually.  No, they didn't.  I mean, it's -- I
2  try to remember to write in all of the, clearly, the
3  relevant things in some sense whenever I want to make sure
4  Pete would know about.  That's all that's in there.
5  Q  Now you did not list in your final report all of the
6  documents that you reviewed before preparing your final
7  report; is that correct?
8  A  That's correct.
9  Q  And for what reason did you not include everything you
10 reviewed?
11 A  I was just trying to include those things that were most
12 important for understanding what I'd written in the
13 report.
14 Q  Do you still have copies of the Gullberg faxes and
15 Gullberg data?
16 A  Probably.
17 Q  Did you have a discussion with Mr. Triesch or anyone from
18 his office about whether to investigate Professor Guest's
19 opinions about search and arrest practices of Trooper
20 Villeneuve?
21 A  Not that I recall.
22 Q  How did you decide not to -- strike that.
23      Is it correct to say that none of your reports or
24 opinions contain any research or cross-tabulations about
25 search and arrests?

Page 273

1  A  That's correct.
2  Q  How did you decide not to do that type of exploration or
3  investigation?
4  A  That's not quite what I testified to --
5  Q  Okay.
6  A  -- but --
7  Q  Let me rephrase that.  Did you do any investigation or
8  exploration into the search or arrest behavior of Trooper
9  Villeneuve?
10 A  Yes, I did some very small amount.  Professor Guest had
11 discussed some of that in his, I think it's in his report.
12 And I took some quick looks to say, "Oh, okay.  What he's
13 saying there seems to be basically in contrast to what he
14 actually does say; is that said correct?"  And yeah, as
15 one would expect.  In fact, interestingly, we were using
16 different software and it seemed to be exactly the same
17 numbers.
18      And there was some discussion with Mr. Triesch where
19 he said that the legal basis for issues having to do with
20 search and arrest were different, and I can't explain what
21 those were.  And, therefore, my understanding of this,
22 which may be flawed, but my understanding is these were
23 somewhat lesser issues in the case.
24 Q  Did you investigate all of the primary variables that you
25 thought should be considered?

Page 274

1  A  I'm not sure what you mean by "primary variables".
2  Q  Well --
3  A  Do you want to ask all the variables?
4  Q  No, because I think you've already testified --
5  A  Okay.
6  Q  -- that there are an infinite number of variable.
7  A  Yes.
8  Q  Would you agree with me that in any statistical
9  investigation you must make a judgment call as to which
10 ones to start with and which ones to leave aside?
11 A  Absolutely.
12 Q  And in your judgment did you investigate all the variables
13 that you thought were most obvious?
14 A  No.  I investigated the ones that I thought were most
15 obvious and which I had readily available data on.  So, in
16 the best of all possible worlds, I can imagine somebody
17 going out and gathering all sorts of other data, but that
18 wasn't -- I don't mean me going out and gathering it, but
19 somebody could, and that wasn't realistic.
20      MR. WING:  Could I just ask you to read back the
21 first part of that?  I don't want to ask any more
22 questions if I've got the answer.
23      (Requested portion was read back.)
24      MR. WING:  Okay.  Thank you.
25 Q  Let me just look at my notes and I think we're about done

25 (Pages 271 to 274)

25

1                          C E R T I F I C A T E

2   STATE OF WASHINGTON   )

3   COUNTY OF KING         )

4              I, SHERRI DEWITT, Notary Public in and for the

5   State of Washington do hereby certify;

6       The foregoing deposition was taken before me at the

7   time and place set forth;

8       The witness was by me first duly sworn to testify the

9   truth; and the testimony of the witness and all objections

10  made at the time of the examination were recorded

11  stenographically by me, and thereafter transcribed by

12  myself;

13      The foregoing transcript is a true record of the

14  testimony of the witness and of all objections made at the

15  time of the examination, to the best of my ability.  I

16  further certify that I am in no way related to the parties

17  or counsel in the action, nor do I have an interest in the

18  matter;

19      WITNESS my hand and Seal this 16th day of December,

20  2005.

21

22  NOTARY PUBLIC in and for the State of

23  Washington, at North Bend.  My Commission

24  expires 5/26/06.

25

SHERRI DEWITT, CCR
1310 Forster Blvd. SW, North Bend, WA  98045
(206) 617-3415

26

# EXHIBIT

# 3

27

Avery Mason Guest, PhD

1                    UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    SHIRLEY LACY,                    )

4                    Plaintiff,       )

5          vs                         ) No. CV 03-2442 P

6    K. L. VILLENEUVE,                )

7                    Defendant.       )

8    ------------------------------------------------------------

9                DEPOSTION UPON ORAL EXAMINATION OF

10                    AVERY MASON GUEST, PhD

11   ------------------------------------------------------------

12

13

14                        9:00 a.m.

15                    September 8, 2005

16              900 Fourth Avenue - Suite 2000

17                    Seattle, Washington

18

19

20

21

22

23

24

25

28

Avery Mason Guest, PhD

Page 26

1  the 40 states APAs, similarly Native Americans are more
2  likely to be issued citations than white drivers in 31 APAs
3  presumably of 40.
4       Likewise a higher proportion of Asian drivers
5  compared to white drivers are likely to be issued citations
6  in 29 APAs presumably of 40.
7       Finally, a higher proportion of Hispanic drivers are
8  issued citations in 39 APAs.  And then the way I read the
9  report it minimizes the importance of this but my concern
10  here is that it suggests a general pattern across the
11  majority of APAs of differential treatment of ethnic
12  minorities.
13  Q   Is there some incorrectness to that?
14  A   Well I believe there is an incorrect interpretation of the
15  data.  I don't challenge the findings about the number of
16  APAs where ethnic minorities are overrepresented.  I would
17  actually have to do a more detailed inspection of the data
18  to ascertain that.
19       What my note is doing is expressing concern about
20  the interpretation or the conclusion that's drawn from the
21  data as presented in the report.
22  Q   Why are you concerned about the conclusion again?
23  A   I'm interested in an accurate presentation of the data.  As
24  a social scientist I believe we have an obligation to
25  accurately interpret our data and it seems to me that an

Page 27

1  intuitive interpretation of the data, regardless whether
2  you're a social scientist, would be that in most of the APA
3  districts there is an overrepresentation of ethnic
4  minorities who are contacted by the state troopers.
5  Q   Is that contrary to the actual findings and interpretations
6  of the report, that intuitive interpretation that you just
7  gave?
8  A   I believe that it is opposite to the general way that the
9  report is written, yes.
10  Q   Anything else on page 62 that you took issue with?
11  A   No.
12  Q   What's the next page that bears a post-it note and why did
13  you place a note on that page?
14  A   Yes, this is page 70, and this is a logistic regression
15  which is similar to the technique that I used in my report,
16  and the dependent variable, or the variable to explain here
17  is whether a citation was issued to the person who was
18  stopped.
19       And my concern here is that the independent
20  variables include the number of violations that the trooper
21  noted, and the seriousness of the violations, and then also
22  includes variables for what I would call social and
23  demographic characteristics of the stops such as -- well
24  actually their gender, age and ethnic identification.
25       And my concern is that it seems to me the question

Page 28

1  of whether a citation is issued has a complicated
2  relationship with the number of violations and the
3  seriousness of the violations.
4       So I would be reluctant to interpret the effects of
5  ethnicity controlling for a number of violations and
6  controlling for seriousness of violations because it seems
7  to me that here the researchers have possibly confused what
8  I would call the independent variables and the dependent
9  variables.
10       So what they want to do is they want to interpret
11  the effects of race on whether a citation is issued
12  controlling for the number of violations and the seriousness
13  of the violation, but I would say that there is kind of
14  circular relationship between the number of violations,
15  seriousness of violation and whether a violation is issued.
16  So I would be reluctant to call number of violations and
17  seriousness of violations an independent or causal variable
18  here.
19  Q   Is there a correct way to do it or is that a matter of a
20  social scientist's interpretation of what should be the
21  independent or the dependent variable?
22  A   I believe that there is a much better way of doing it, yes.
23  Q   And that's the way you just identified?
24  A   I haven't identified the alternative.
25  Q   But you're saying this choice of I guess the dependent

Page 29

1  variable is incorrect?
2  A   Yes, I would say that it doesn't meet normal social science
3  standards, yes.
4  Q   What's the next page you have a post-it note on and why?
5  A   Okay, this is page 93 and my comment on the tab is what is a
6  non-discretionary search and this is a page that analyzes
7  the relationship of ethnicity to searches by whether they
8  are discretionary or not.
9       I use the terms of the report and my question is
10  what is a non-discretionary search and I'm not -- I'm still
11  not clear what is a non-discretionary search so I have
12  trouble interpreting the data because I don't understand
13  what the variable is.
14  Q   With the exception of the seven pages where you found
15  interpretations or data or both with which you took issue do
16  you have any concern about any other aspects of the WSU
17  traffic stop data analysis project dated June 1, 2003?
18  A   I can't answer that question with a simple yes or no, I'm
19  not an expert enough at this point on the whole report to
20  make an expert judgment about the overall report.
21  Q   With the exception of the seven pages where you found
22  specific concerns do you agree with the general protocols
23  used by the researchers in creating that study?
24       MR. WING:  Objection, asked and answered.  Go
25  ahead.

8 (Pages 26 to 29)

29

Avery Mason Guest, PhD

Page 82

1   And then, let's see, then I recoded the age of the
2   subject, the age of the subject was described in single
3   years and I grouped them into major age groups which
4   correspond to life cycle stages of people.
5   Q   Why?
6   A   Because I thought that the troopers possibly could treat
7   people by race differently in different age groups.  As an
8   example you could think that people in their early 20s might
9   just generally be what I would call wild and crazy and that
10  troopers would not make any distinction on the basis of race
11  because in effect their behavior would be really just
12  generally outrageous or prankster-ish, so I thought there
13  might not be a big difference by age and race among or by
14  race among young adults or young drivers.
15  On the other hand you might think that among middle
16  aged, what I would call middle-age people, which I would
17  describe personally as 35 to 54, that behavior would be
18  generally more law abiding and that there would be a greater
19  possibility of finding racial differentials.
20  In other words it would be easier to make
21  distinctions on the basis of race and stopping, arresting
22  and searching people so I split them up by major age groups
23  and in my report I do have one table which refers to people
24  35 to 54, which I would call from my 64 year old perspective
25  I would call middle-aged.

Page 83

1   Race, race I recoded into three groups, white, black
2   and other racial groups and the primary reason for that was
3   that there were often small numbers of people in the
4   specific other categories and it was hard to make much sense
5   of the data.
6   And then the search variable I recoded the search
7   variable into whether there was a search done or not.  Right
8   now, it's in three categories, so there is no search, search
9   done with no contraband found and search done with
10  contraband found and I felt that it was difficult to tell
11  the causal relationship between contraband and having a
12  search done, and so I just combined together the S and C
13  codes which are whether contraband was found or not.
14  I believe those were the major recodes that I made
15  in the data.
16  Q   You said major, I'm asking you to tell me if you created any
17  variables and you've listed four, you call them recodes, to
18  me that's as good as created.
19  A   I would agree.
20  Q   Are there any others besides the four that you've informed
21  me about?
22  A   I did some work with DUI data which is contained in the UCR
23  arrest code and I did some recoding of that but I abandoned
24  it for reasons which I've described earlier and I can't
25  honestly remember exactly how I recoded those data on DUI.

Page 84

1   (Exhibit No. 5 marked)
2   Q   Dr. Guest, I've made Exhibit No. 5, which is your report, a
3   part of your deposition, and I'm going to ask some questions
4   about it, so you can testify from the report or any part of
5   the file you wish in answering my questions.
6   First of all does Exhibit No. 5, which is a copy of
7   your report, reflect all of the work you've done on this
8   case?
9   A   No.
10  Q   What is not reflected?
11  A   I did some tabulations of the data which are not reported
12  here.
13  Q   What tabulations did you do?
14  A   I can't remember each and every tabulation that I did but I
15  will try honestly to summarize the other types of
16  tabulations that I did.  So I told you a bit about the DUI
17  issue.  I did some tabulations looking at the relationship
18  between race and driving under the influence.
19  I also did tabulations on the search variable,
20  whether contraband was found or not found before I recoded
21  it and used the recoded version in my report.
22  Q   What did you do with that data and why?
23  MR. WING:  Asked and answered.
24  MR. TRIESCH:  I'll restate it.
25  Q   What did you do with that tabulation and why?

Page 85

1   A   I ran it on my computer but I didn't save it, I don't have
2   the tabulation.
3   Q   Was there anything about that that you can recall about what
4   was revealed in the computer result?
5   A   No, there really isn't.  I can't tell you anything
6   specifically about that.  I was bothered by the causal
7   relationship and whatever the pattern was I worry about
8   that, led me to abandon that, but I can't recall what the
9   finding was.
10  Q   So what other work did you do that's not reflected in your
11  report?
12  A   I also did some work on the type of contact looking at
13  relationship of officer, race and the type of contact that
14  was made, what's called contact variable here.  And then I
15  ran most of the tabulations that are reported in my report
16  for the state, or I think I ran virtually all of them for
17  the state also just to make sure that I wasn't just looking
18  at a pattern that was unique to APA 5.
19  Q   I missed what you were just referring to, is this the fourth
20  category of tabulation?  I mean let me stop you for a
21  minute, please.
22  A   Sure.
23  Q   I don't want to be confused and get off track here.  I
24  understand you ran a tabulation dealing with race and DUI
25  and you abandoned that?

22 (Pages 82 to 85)

30

Avery Mason Guest, PhD

Page 86

1   A   That's right.
2   Q   And I understand that you ran a tabulation regarding search
3       if contraband is found or not found and you also abandoned
4       that?
5   A   Yes.
6   Q   Then I understand that you ran a tabulation regarding the
7       type of contact?
8   A   That's correct.
9   Q   What is it that you did with reference to the type of
10      contact?
11  A   I looked at racial differences among officers and how
12      contact occurred, what was the nature of the contact between
13      officers, race and the specific type of contact.
14  Q   What did you do with the results of that tabulation?
15  A   I also abandoned those.
16  Q   Why?
17  A   I was bothered by the fact that some of these categories are
18      quite vague and almost 90 percent of the contacts are
19      described as self-initiated contacts by the officer, and I
20      kind of have a sense of what that would be.
21          For instance I'm sure that speeding would be a
22      self-initiated contact by the officer but I also had trouble
23      figuring out what are other categories of self-initiated
24      contact. But to try to summarize briefly my concern there,
25      since about 90 percent of the cases were in one category I

Page 87

1       didn't feel that I was going to get a lot out of analyzing
2       all of these categories together.
3           Another problem I had with the contact data was that
4       there were often very small numbers of cases for both
5       Officer Villeneuve and other officers in APA 5, and so it
6       was hard in honesty to make much interpretation of the data.
7   Q   Okay, and then the fourth tabulation that you did that is
8       not part of your report you were describing when I
9       interrupted and I didn't understand what it was.
10  A   Every tabulation that is in my report was also done for the
11      whole state. So as an example rather than simply compare
12      Officer Villeneuve, Trooper Villeneuve with the other
13      officers in APA 5 I compared her with all of the other
14      officers in the state.
15  Q   But you did not include those in your report?
16  A   I included one in my report. Would you like to know which
17      one that is?
18  Q   I already know which one it is, why did you include it in
19      the report?
20  A   One of the patterns that I found was only marginally
21      statistically significant and even though there is a fairly
22      important difference there and so I wanted to replicate it
23      for the state and see what would happen with the state. In
24      the case of the state it is statistically significant.
25  Q   Were there any other tabulations or assessments or analyses

Page 88

1       of any kind that you did that did not wind up in your
2       report?
3   A   There is one other. I did many of the tabulations both for
4       APA 5 and for the state using all of the racial categories,
5       but as I explained earlier to you it was often difficult to
6       make much sense of them because the numbers of members of
7       specific ethnic groups, except for blacks, and possibly
8       Asians, turned out to be quite small.
9   Q   Does that exhaust the tabulations, assessments and analyses
10      that you did in your work on this case that did not wind up
11      in your report, those five areas?
12  A   To the best of my knowledge, yes.
13  Q   Did you use any variables that are not included in your
14      report or is that part of your prior answer?
15  A   That was part of my prior answer.
16  Q   And again you have no knowledge of Trooper Villeneuve's
17      specific behaviors regarding this stop of Shirley Lacy
18      except as reflected in a citation provided to you by Mr.
19      Wing, is that correct?
20  A   Yes, that's correct.
21          MR. WING: Objection, asked and answered.
22  Q   And you did not participate in the quality control protocols
23      in the collection of this data from WSU, correct?
24  A   That is correct.
25  Q   Do you know if this is, and I may have already asked this

Page 89

1       and just confused, but is this all of the data that WSU had
2       regarding traffic stops by Washington state patrol troopers?
3   A   I don't know.
4   Q   Is this all the data that the state patrol had?
5   A   I don't know that either.
6   Q   Did you ever inquire of WSU whether they had other data?
7   A   No.
8   Q   Did you ever inquire of the Washington State Patrol if it
9       had other data?
10  A   No.
11          MR. TRIESCH: Off the record.
12          (Noon recess taken)
13          MR. TRIESCH: Back on the record.
14  Q   Dr. Guest, when we concluded for the lunch break we were
15      talking about whether or not you knew if WSU had more data
16      or the state patrol had more data than you received and I
17      think you indicated you do not know whether they do,
18      correct?
19  A   That's correct.
20  Q   If a wider range of data were available to you would it
21      affect how much you rely on the data provided to you by
22      Mr. Wing?
23          MR. WING: Objection, vague.
24  A   I considered the data provided me by Mr. Wing to be quite
25      adequate.

23 (Pages 86 to 89)

31

# EXHIBIT

# 4

32

HON. JAMES L. ROBART

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10   SHIRLEY LACY,                                    NO. CV 03-2442 JLR

11                                 Plaintiff,
           vs.                                        DECLARATION OF SERVICE
12
     K. L. VILLANEUVE,
13
                                   Defendant.

14

15         I, Jesse Wing, hereby declare as follows:

16         I am counsel for plaintiff and have personal knowledge of the facts herein.  On this date

17   I had hand delivered a true and correct copy of the below listed documents to:

18

19   Paul J. Triesch, WSBA 17445
     Timothy E. Steen, WSBA 35560
20   Shannon E. Inglis, WSBA 23164
     Assistant Attorney Generals
21   Attorney General of Washington
     Tort Claims Division
22   Mail Stop TB 14
     900 4th Ave, #2200
23   Seattle, WA  98164-1012
24   Attorneys for Defendant

25

DECLARATION OF SERVICE - 1

MacDonald Hoague & Bayless

1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

33

1.   Plaintiff's Second Supplemental Answers and Responses to Defendant's First Interrogatories and Requests for Production of Documents

2.   Plaintiff's Disclosure of Expert Witnesses

3.   Report of Expert Witness Anthony J. McElroy

4.   Supplemental Expert Report of Anthony McElroy

5.   Expert Report of Avery Mason Guest, Ph.D.

6.   Supplemental Expert Report of Avery Mason Guest, Ph.D.

7.   Declaration of Service

DATED this _14th_ day of July, 2005.

MacDONALD HOAGUE & BAYLESS

By _____
Jesse Wing, WSBA #27751
Attorneys for Plaintiff

DECLARATION OF SERVICE - 2

MacDONALD HOAGUE & BAYLESS

1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

34

HON. JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

SHIRLEY LACY,

                        Plaintiff,

            v.

K. L. VILLANEUVE,

                        Defendant.

No. CV03-2442JLR

SUPPLEMENTAL EXPERT REPORT OF
AVERY MASON GUEST, Ph.D.

1.      Attached on CD ROM is the data on which I based my Report, documents I cited in my Report, and a copy of my *curriculum vitae* listing the publications that I have authored during the past ten years.

2.      Plaintiffs have agreed to pay me $50 per hour for any work I perform related to this matter.

3.      I have not testified as an expert at trial or by deposition within the past four years.

//

//

//

SUPPLEMENTAL EXPERT REPORT OF
AVERY MASON GUEST, Ph.D. - 1
No. CV03-2442JLR

MacDonald Hoague & Bayless
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

1    DATED this ___13th___ day of ___July_____, 2005, at ___King County___,

2    Washington.

3

4                              _Avery Mason Guest_

5                              Avery Mason Guest, Ph.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPPLEMENTAL EXPERT REPORT OF
AVERY MASON GUEST, Ph.D. - 2
No. CV03-2442JLR

MacDonald Hoague & Bayless

1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

36